# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | | |
|---|---|---|
| JOYCE ULCH<br>on behalf of the SOUTHEASTERN<br>GROCERS 401(k) SAVINGS PLAN,<br>herself, and all others similarly Situated, | ) ) ) ) | |
| | ) | Civil Action No. |
| *Plaintiff(s)* | ) | |
| | ) | |
| v. | ) | COMPLAINT |
| | ) | |
| SOUTHEASTERN GROCERS LLC,<br>as Plan Sponsor for SOUTHEASTERN<br>GROCERS 401(K) SAVINGS PLAN, | ) ) ) | |
| | ) | |
| *Defendant.* | ) | |
| _____ | ) | |

## CLASS ACTION COMPLAINT

1. This action seeks to protect the retirement savings of more than 12,000 SOUTHEASTERN GROCERS, LLC ("Defendant" or "SOUTHEASTERN") employees who are participants in the SOUTHEASTERN GROCERS 401(K) SAVINGS PLAN ("the Plan").

2. SOUTHEASTERN has a fiduciary duty to ensure that its Plan does not charge excessive fees to Plan participants. But over the past six years, Plan participants have paid over $5,000,000 in administrative fees. Reasonable fees for the specific services rendered to the Plan are about $1,500,000. SOUTHEASTERN wasted nearly $3,500,000 of retirement plan participant savings. Plan participants

will continue to pay grossly excessive fees, and millions and millions of retirement savings will be frittered away going forward unless this action moves forward.

3.     Plaintiff, Joyce Ulch ("Plaintiff"), brings this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce liability under 29 U.S.C. §1109(a) and to restore to the Plan all losses resulting from SOUTHEASTERN'S breaches of fiduciary duty.

## JURISDICTION AND VENUE

4.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

5.     This judicial district is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plan is administered, and where at least one of the alleged breaches took place.

## ERISA

6.     The ERISA fiduciary duty of prudence is among "the highest known to the law" and requires fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). As a fiduciary to the Plan, SOUTHEASTERN is obligated to act for the exclusive benefit of the Plan and to ensure that the Plan's expenses are reasonable. *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019).

Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

7.     "ERISA is a remedial statute designed to protect the interests of plan participants and beneficiaries…Courts should not hasten to employ technical rules of pleading and practice to defeat that goal." *Degnan v. Publicker Industries, Inc*., 83 F.3d 27, 30 (1st Cir. 1996). This principle favors liberal construction of pleadings. *Fitzgerald v. Codex Corp*., 882 F.2d 586, 589 (1st Cir. 1989); *see also Jackson v. Truck Drivers' Union Local 42 Health & Welfare Fund*, 933 F. Supp. 1124, 1134 (D. Mass. 1996).

8.     While everyone who participates in a 401(k) plan pays fees to maintain their account, industry insiders report that over 70% of people do not believe they pay any fees. To help the public obtain a better grasp on the fees they pay in retirement plans, the Department of Labor passed regulations in 2012 that require plan administrators to disclose fee and expense information to plan participants. However, most plan participants are still in the dark concerning the actual amount of fees they pay. The lack of understanding is not surprising. Often, fees are hidden from plain view. In many cases, plan providers do not make the fee and expense disclosures that the Department of Labor requires.

9.     Such is the case here. The account statements that SOUTHEASTERN

provides to its Plan participants do not disclose the compensation paid to third-party service providers by Plan participants. In addition, the Plan's Annual Form 5500 Department of Labor reports are supposed to identify the compensation paid to third parties, but as discussed below, they do not. These failures of process, transparency, and disclosure support Plaintiff's claims.

10.     SOUTHEASTERN's fiduciary obligations with respect to the Plan are especially important because Plan participants cannot negotiate fees charged to Plan participants. Plan participants must trust that SOUTHEASTERN will prudently do so. SOUTHEASTERN is also responsible for selecting investments and hiring service providers for the plan. These fiduciary decisions have the potential to dramatically affect the amount of money that participants can save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of 28% in savings at retirement. U.S. *Dep't of Labor, A Look at 401(k) Plan Fees*, at 1-2 (Aug. 2013).

11.     That is, if a person placed $25,000 in a retirement account, made no other contributions to the account for 35 years, averaged a 7% return for 35 years, and paid .5% in fees, the account balance will grow to $227,000. But if the fees are increased by just 1%, the 1% increase costs a staggering $64,000, or 28% of the retirement savings. *Id*.

12.     Accordingly, SOUTHEASTERN must engage in a rigorous process to

control fees and ensure that Plan participants pay no more than a reasonable level of fees and compensation to Plan service providers. This is particularly true for billion-dollar plans, like the Plan here, which have the bargaining power to obtain the highest level of service and the lowest fees. The fees available to billion-dollar retirement plans are orders of magnitude lower than the much higher retail fees available to small investors.

13.   The entities that provide administrative services and investments to retirement plans have a strong incentive to maximize their fees. Each dollar in fees paid from participants' retirement savings reduce by the same amount participants' retirement savings, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, participants' retirement security is directly affected by the diligence used by plan fiduciaries to control, negotiate, monitor, and reduce a plan's fees.

14.   Plan fiduciaries must be cognizant that self-interested third parties seek to maximize fees from plans, and fiduciaries may not simply accede to demands or agree to quotes without negotiating or considering alternatives. To act in the exclusive interest of a plan and not in the service providers' interest, fiduciaries must negotiate as if their own money was at stake.

## THE PLAN

15.   The Plan is a qualified retirement plan commonly referred to as a 401(k)

plan.

16. The Plan is established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

17. SOUTHEASTERN is a statutory fiduciary to the Plan.

18. Eligible current and former employees of SOUTHEASTERN are eligible to participate in the Plan. The Plan provides the primary source of retirement income for many former SOUTHEASTERN employees.

19. Defined contribution retirement plans are generally classified as follows: "Micro" plans (<$5 million in assets); "Small" plans ($5 million-<$50 million); "Mid" plans ($50 million-<$200 million); "Large" plans ($200 million-<$1 billion); and "Mega" plans (>$1 billion).

20. As of December 31, 2021, the Plan had $1,050,695,424 in assets and 12,174 participants with account balances. Thus, the Plan qualifies as a "mega" plan in the 401(k) marketplace.

21. Instead of leveraging the Plan's tremendous bargaining power to benefit Plan participants, SOUTHEASTERN caused the Plan to pay unreasonable and excessive fees.

## THE PARTIES

22. Plaintiff has been employed by SOUTHEASTERN since 1988 and is a current Plan participant.

23. Plaintiff has statutory standing to bring this action because 29 U.S. §1132(a)(1) allows a plan participant to file a civil action that seeks relief on behalf of the Plan. Here, the Plan suffered millions of dollars in losses caused by SOUTHEASTERN's fiduciary breaches. Plaintiff alleges she and Plan participants suffered the same losses resulting from the ERISA violations committed by SOUTHEASTERN as set forth herein. Specifically, Plaintiff, like all Plan participants, paid direct and indirect compensation to the Plan's recordkeeper that was excessive. Accordingly, Plaintiff, like all Plan participants, lost money caused by SOUTHEASTERN's ERISA breaches. All relief in this action sought by the Plaintiff is sought on behalf of the Plan.

24. To establish constitutional standing (or Article III standing), a Plaintiff must only demonstrate a concrete and particularized injury flowing from SOUTHEASTERN's ERISA fiduciary breaches. Plaintiff alleges that her individual account in the Plan suffered losses because her account was assessed excessive fees, which would not have been incurred had SOUTHEASTERN discharged its ERISA fiduciary duties to the Plan and ensured fees were reasonable. That money (millions of dollars) should have gone towards Plan participants' retirement; instead, it went elsewhere. Accordingly, Plaintiff alleges concrete and particularized injuries. Plaintiff also has standing because she is seeking injunctive and equitable relief on behalf of the Plan.

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of herself and the following proposed class ("Class"):

> All persons who were participants in or beneficiaries of the SOUTHEASTERN Savings Plan at any time between September 27 2017, and the present (the "Class Period").

26.     The members of the Class are so numerous that a joinder is impractical. According to the Plan's Annual Form 5500 for the year ending 2021, filed with the U.S. Department of Labor, there were 12,174 Plan participants with account balances as of December 31, 2021.

27.     Plaintiff's claims are typical of Class members' claims. Like other Class members, Plaintiff participated in the Plan and suffered injuries because of SOUTHEASTERN's ERISA fiduciary breaches. SOUTHEASTERN treated Plaintiff consistently with other Class members and managed the Plan as a single entity. Plaintiff's claims and Class members' claims arise out of the same conduct, policies, and practices of SOUTHEASTERN as alleged herein, and all members of the Class have been similarly affected by SOUTHEASTERN's ERISA violations.

28.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.     Whether SOUTHEASTERN is a fiduciary of the Plan;

B.     Whether SOUTHEASTERN breached its fiduciary duty of prudence by engaging in the conduct described herein;

C.     Whether SOUTHEASTERN failed to prudently monitor other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.     Whether SOUTHEASTERN caused the Plan to pay excessive fees for administrative services;

E.     The proper form of equitable and injunctive relief; and

F.     The proper measure of relief.

29.    Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class actions. Plaintiff has no interests antagonistic to those of other putative Class members. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this action as a class action.

30.    This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for SOUTHEASTERN. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be

dispositive of the interests of other members not parties to this action or that would substantially impair or impede their ability to protect their interests.

31.    In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because SOUTHEASTERN has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## EXCESSIVE RECORDKEEPING FEES
### *Background on Plan Administrative Fees*

32.    Plan administrative services are sometimes called recordkeeping services. The recordkeeper keeps track of the amount of each participant's investments in the various options in the plan, and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These administrative services are largely commodities, and the market for them is highly competitive.

33.    Nearly all recordkeepers in the marketplace offer the same range of services.

34.    The market for recordkeeping is highly competitive, with many vendors equally capable of providing the same services. As a result of such competition, recordkeepers vigorously compete for business by offering the best price.

35. The specific services chosen by a large plan do not affect the amount charged by recordkeepers. Instead, recordkeeping expenses are driven by the number of participants in a plan. In other words, the cost of providing recordkeeping services depends mainly on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, most plans are charged on a per-participant basis.

36. Recordkeeping expenses can be paid directly from plan assets, indirectly by taking money from plan participants' individual accounts, or a combination of both.

37. In a typical direct recordkeeping compensation arrangement, the plan contracts with a recordkeeper to obtain services in exchange for a flat annual fee based on the number of participants for which the recordkeeper will be providing services—for example, $25.00 per year, per plan participant.

38. A flat price based on the number of participants in the plan ensures that the amount of compensation is tied to actual services provided and does not grow based on matters that have nothing to do with actual services provided by a recordkeeper, such as an increase in plan assets due to market growth or greater plan contributions by employees.

39.     For illustration purposes, a plan with 10,000 participants and $1 billion in assets may issue a request for proposal to several recordkeepers, requesting the recordkeepers provide pricing based on a flat rate for a 10,000-participant plan. If the winning recordkeeper offers to provide the recordkeeping services at a flat rate of $25.00 per participant, per year, the fiduciary contracts with the recordkeeper for the plan to pay a $250,000 direct annual fee (10,000 participants at $25.00 per participant). The recordkeeping fee is not tethered to the plan's assets. If the plan's assets double to $2 billion, the recordkeeping fee is still $25.00 per participant.

40.     Such a flat per-participant agreement does not necessarily mean, however, that every participant in the plan must pay the same $25.00 fee from his or her account. The plan could reasonably determine that assessing the same fee to all participants would discourage participants with relatively small accounts from participating in the plan and that, once the aggregate flat fee for the plan has been determined, a proportional asset-based charge would be best. In that case, the flat per participant rate of $25.00 per participant multiplied by the number of participants would simply be converted to an asset-based charge, such that every participant pays the same percentage of his or her account balance. For the $1 billion plan in this example, each participant would pay a direct administrative fee of 0.025% of his or her account balance annually for recordkeeping ($250,000/$1,000,000,000 = 0.00025). If plan assets increase thereafter, the percentage would be adjusted

downward so that the plan is still paying the same $250,000 price that was negotiated at the plan level for specific services to be provided to the plan.

41.    Recordkeepers in the marketplace offer an array of other fee and expense models. These often include some combination of dollar-per-head and asset-based approaches. Plaintiff is not alleging that SOUTHEASTERN was required to use a direct payment arrangement, or any specific payment arrangement for that matter. Rather, Plaintiff is simply providing details on how direct payment methods operate and provides these details to illustrate (together with all the allegations herein) that the recordkeeper fees the Plan participants are paying are excessive relative to the specific services provided to the Plan and that SOUTHEASTERN should have done more to investigate, monitor, request, negotiate, and secure reasonable fees for the Plan.

42.    The Plan's recordkeeper is Fidelity Investments Institutional. ("Fidelity"). Fidelity receives direct and indirect fees/compensation from the Plan.

### *Defendant Caused the Plan to Pay Excessive Direct Compensation for Recordkeeping to Fidelity*

43.    According to the Plan's Summary Annual Report for the year ending December 31, 2021, SOUTHEASTERN caused the Plan to pay $1,268,223.00 in "administrative expenses" during 2021. Of those "administrative expenses," SOUTHEASTERN disclosed in the Plan's 2021 Annual 5500 that the Plan paid Fidelity $897,469 in direct compensation (the number is understated), but assuming

it is accurate, given that there were 12,174 Plan participants in 2021, that means Fidelity received roughly $73.72 from each plan participant in direct compensation. This amount alone is excessive. A reasonable amount of total compensation for the specific services Fidelity provided to the Plan ought to have been no more than $25 per person or $304,600. But there is more.

44.    Fidelity also receives indirect compensation. Fidelity receives indirect compensation in two material ways. First, Fidelity receives compensation via "float" on Plan participant money. Second, Fidelity collects compensation on the money invested in the Plan through a practice known as revenue sharing.

45.    With regard to compensation via float, SOUTHEASTERN agreed that anytime Plan participants deposit or withdraw money from their individual accounts in the Plan that the money will first pass through a Fidelity clearing account. Plan participant money typically sits in Fidelity's clearing account for at least 2-3 days. SOUTHEASTERN also agreed that Fidelity could keep the investment returns and/or any interest earned on this money while the money is in Fidelity's clearing account. This is a form of indirect compensation that Fidelity receives as the recordkeeper for the Plan. This indirect compensation is on top of the direct compensation – and the direct compensation is already double the amount of total reasonable compensation.

46.     The Plan's Annual Form 5500s for the four years preceding 2021 show that hundreds of millions of dollars were transferred in and out of the Plan every year. However, the Plan's Annual Form 5500s do not disclose any compensation that Fidelity receives via float.

47.     SOUTHEASTERN has not tracked, monitored, nor negotiated the amount of compensation Fidelity receives from the return it earns on Plan participant money while the money is in Fidelity's clearing account. Discovery will prove Fidelity earned millions of dollars in float compensation.

48.     To determine the amount of compensation Fidelity earned via float during the relevant time period, Plaintiff will need to subpoena Fidelity for records showing how Fidelity invested the float money, and what Fidelity earned on the investments. This is information a prudent fiduciary should already have and include in negotiating the compensation of a recordkeeper of a billion-dollar plan, like the Plan here. Defendant imprudently failed to do so.

49.     In 2021 alone, the Plan's Annual Form 5500 shows there was more than $295 million transferred into and out of the Plan. If Fidelity earned just 1% of this money, then it would have earned $2.95 million in compensation from the Plan via float in 2021. This amount is far more than the already excessive direct compensation that SOUTHEASTERN discloses Plan participants compensate Fidelity for the specific services it provides to the Plan.

- 15 -

50.    The Department of Labor has issued guidance concerning fiduciary duties for payment of compensation via float. The Department of Labor guidance takes the position that an ERISA fiduciary acts imprudently when it allows recordkeepers to receive float compensation, unless the recordkeeper discloses sufficient information to enable the plan to make an informed decision with respect to the float arrangement, the plan has reviewed and agreed to the arrangement, and the arrangement does not permit the service provider to influence the amount of its compensation.

51.    For example, in 2002, the Department of Labor issued Field Assistance Bulletin 2002-3 (Nov. 5, 2002), available at http://www.dol.gov/ebsa/regs/fab2002-3.html. Specifically, the bulletin describes what a fiduciary needs "to consider in evaluating the reasonableness of an arrangement under which the service provider will be retaining 'float' and what information [] a service provider [is] required to disclose to plan fiduciaries with respect to such arrangements to avoid engaging in a prohibited transaction[.]" *Id.* at *1. The document then sets out steps that plan fiduciaries and service providers should take to ensure that float practices are adequately disclosed and reviewed.

52.    The DOL Bulletin lists three primary duties with respect to float compensation for plan fiduciaries, related to their responsibility for conducting a prudent and competent review of float compensation, and three primary duties for a

service provider to a plan, primarily related to fully disclosing to plan fiduciaries how float compensation is to be earned. A fiduciary is required to: (1) review comparable providers to determine for whom float is credited; (2) review the circumstances under which float is earned (such as the inclusion of time limits for earning float income); and (3) review sufficient information to evaluate float as part of the total compensation to be paid for the services rendered under the agreement. *Id.* A service provider is required to: (1) disclose the specific circumstances under which float compensation is taken and maintained, (2) establish and adhere to time frames with respect to depository and redemptive float, and (3) disclose the rate and manner by which float is earned.

53. SOUTHEASTERN breached its fiduciary duty of prudence by allowing Fidelity to receive compensation from Plan participants without even knowing the amount of compensation Fidelity collects from interest/earnings on participant money as to the float, and because the amount of indirect compensation Fidelity receives via the float is excessive relative to the specific services provided to the Plan by Fidelity and excessive relative to prudent options in the marketplace, and otherwise utterly failing to comply with DOL guidance concerning how prudent fiduciaries ought to treat float compensation.

54. Fidelity also receives indirect compensation via revenue sharing. In a revenue-sharing arrangement, the amount of compensation for recordkeeping

- 17 -

services to a plan is not based on the actual value of such services. Instead, compensation is based on the amount of assets in the plan, or the amount of assets in certain investments in the plan. For example, the recordkeeper will agree to a fee that is tethered to the amount of assets in a plan. The fees will grow to unreasonable levels if plan assets grow while the number of participants, and thus the services provided, does not increase at a similar rate. By way of example, if a recordkeeper contracts to receive one percent annually of assets in the plan as indirect compensation for a plan with one hundred participants and $250,000 in plan assets, the recordkeeper would receive $2,500 per year in fees, or $25.00 on a per plan participant basis. But if the plan assets increased to $250,000,000 – and the contract remains the same, the recordkeeper receives $2,500,000 per year in fees, or $25,000 per plan participant. This would be an excessive fee by any measure.

55. Revenue sharing, while not a *per se* violation of ERISA, can lead to massively excessive fees if not properly understood, monitored, and capped. If a fiduciary decides to use revenue sharing to pay for recordkeeping, it is required that the fiduciary (1) determine and monitor the amount of the revenue sharing and any other sources of compensation that the provider has received, (2) compare that amount to the price that would be available on a flat per-participant basis, or other fee models that are being used in the marketplace, and (3) ensure the plan pays a reasonable amount of fees.

56.   Self-interested recordkeepers prefer fee agreements that allow them to receive direct and indirect compensation for recordkeeping. Recordkeepers often tout the direct fees they collect as being "reasonable," while they surreptitiously pocket excessive fees from Plan participants via indirect fees. Such is the case here (although the direct compensation is also excessive).

57.   Recordkeepers often attempt to construct their fee agreements so that their fees are not solely tied to any actual services, but to the amount of assets in a plan (*i.e.*, float and revenue sharing). That way, as Plan assets increase, so do the recordkeeper's fees. Again, utilizing an approach that allows recordkeepers to collect fees indirectly is not *per se* imprudent. Plaintiff is not making a claim against SOUTHEASTERN merely because it allowed the Plan's recordkeeper to pocket direct and indirect fees. However, as is the case here, when indirect fees are left unchecked, they can be devastating for Plan participants. As one commentator noted, "[A]t worst, revenue sharing (one source of indirect fees) is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It is a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the

plan is 'free' when it is in fact expensive." *See* Justin Pritchard, "Revenue Sharing and Invisible Fees."[1]

58.    Another commentator likened a revenue-sharing fee arrangement to hiring a plumber to fix a leaky gasket but paying the plumber based on the amount of water that flows through the pipe rather than the actual work provided. If asset-based fees are not monitored, the fees skyrocket as more money flows into the Plan.

59.    It is well-established that plan fiduciaries have an obligation to monitor and control recordkeeping fees to ensure that such fees remain reasonable. *See*, *e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach [] their fiduciary duties" when they "fail [] to monitor and control recordkeeping fees" incurred by the plan). Excessive expenses "decrease [an account's] immediate value" and "depriv[es] the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328. No matter the method of payment or fee collection, the fiduciary must understand the total amount paid to the recordkeeper and per-participant fees and determine whether pricing is competitive. *See Tussey II*, 746 F.3d at 336. Thus, defined contribution plan fiduciaries have an ongoing duty to ensure that the recordkeeper's fees are reasonable.

---

[1]    Available at: http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited December 28, 2022).

60.     In 2017, the Plan had 15,136 active participants with $897,590,303.00 invested in the Plan. In 2021, the Plan had 12,174 active participants with $1,050,695,424.00 invested in the Plan. Thus, from 2017 to 2021, the Plan's active participants decreased by 2,962 participants. However, the Plan's assets increased by over $150,000.00. As such, the revenue sharing compensation that Fidelity receives from the Plan, because it is not tethered to any actual services, has sky-rocketed while the actual services Fidelity provides to the Plan has *decreased* (because the number of active participants has *decreased)*. This is exactly the scenario prudent fiduciaries prevent from happening.

61.     SOUTHEASTERN has not disclosed the exact amount of compensation Fidelity receives from the Plan via revenue sharing. That is likely because SOUTHEASTERN does not know the exact amount of compensation Fidelity receives via revenue sharing. This is another indication of SOUTHEASTERN's imprudence.

62.     Ironically, the Plan's 2021 5500 lists over fifteen funds in which Fidelity discloses it receives revenue sharing compensation. And Fidelity's revenue sharing compensation will continue to grow as Plan assets grow while Fidelity provides no additional services to the Plan. However, because no detailed disclosures were made, the precise amount of revenue sharing dollars Fidelity collected can only be obtained through formal discovery.

63. Prudent fiduciaries implement three (at minimum) related processes to prudently manage and control a plan's recordkeeping costs.

64. First, they must closely monitor the recordkeeping compensation being paid to the recordkeeper. A prudent fiduciary tracks the recordkeeper's compensation by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

65. Second, prudent fiduciaries make an informed and reasoned evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee from a plan for the services provided to a plan. A prudent fiduciary must identify *all* compensation, including direct compensation and indirect compensation being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries closely monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any excessive compensation received by a recordkeeper be returned to the plan and its participants. Additionally, to the extent prudent fiduciaries agree that recordkeepers receive interest or float income from funds transferred into or out of a plan, fiduciaries track and control these amounts as well.

66.     Third, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by similar plans, as well as the recordkeeping rates that are available in the marketplace. This will generally include conducting a request for proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if a plan experiences an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

67.     Fidelity has been the Plan's recordkeeper during the entirety of the Class Period. In fact, Fidelity has been the Plan's recordkeeper since at least 2012.

68.     Based on the information available thus far to Plaintiff, including client documents disclosed by the Plan, SOUTHEASTERN failed to conduct RFPs at reasonable intervals. More specifically, it appears that SOUTHEASTERN went at least six years without soliciting bids for recordkeeping and investment management services, while, at the same time, similar plans paid less for services during that time. This imprudent failure exacerbated the losses suffered by the Plan and caused the Plan to overpay for recordkeeping during the entire Class period.

69. Simply put, in this case, the compensation Fidelity extracted from the Plan is excessive in relation to the specific services Fidelity provided to the Plan.

70. The services offered by Fidelity are offered by all recordkeepers.

71. Here, SOUTHEASTERN failed to prudently manage and control the Plan's recordkeeping costs and other compensation paid to Fidelity.

72. Based on information available thus far to Plaintiff, including client documents disclosed by the Plan, SOUTHEASTERN failed to obtain competitive bids ("RFP") during the Class Period, which caused the Plan to overpay for recordkeeping during the entire Class Period.

73. By going through an RFP process annually, or at least every three years, a prudent plan fiduciary can review the level of service provided by the recordkeeper and compare fees in the marketplace to those being offered by the current recordkeeper. This also allows the plan fiduciary to negotiate with its current provider for a lower fee and/or move to a new provider to provide the same or better services for a more competitive and reasonable fee.

74. A review of the Plan's payments to Fidelity illustrates SOUTHEASTERN's failure to monitor the Plan's expenses.

75. For instance, in 2018, the Plan had almost 15% more participants (14,064 v. 12,174) but paid Fidelity only $480,184.00 in direct compensation, equal to $34.14 per participant.

76.    During the class period, the number of Plan participants and payments to Fidelity have generally shared an inverse relationship. The number of participants has declined while the compensation paid directly to Fidelity has grown. Based on the information contained in the Plan's Annual Form 5500 disclosures from 2017 to 2021, Fidelity received at least the following direct compensation from the Plan:

| Year | Participants | Direct Payments to Fidelity | Direct Payment per Participant to Fidelity |
|------|-------------|------------------------------|---------------------------------------------|
| 2017 | 15,136 | $656,613.00 | $43.38 |
| 2018 | 14,064 | $480,184.00 | $34.14 |
| 2019 | 13,454 | $800,879.00 | $59.52 |
| 2020 | 13,107 | $743,676.00 | $56.74 |
| 2021 | 12,174 | $897,469.00 | $73.72 |

77.    As noted above, Fidelity did not receive only direct compensation—it received even more compensation through indirect payments. However, those amounts are simply not disclosed to Plan participants.

73. SOUTHEASTERN's Annual Form 5500 Reports (mandatory Department of Labor disclosures) do not disclose the amount of any indirect fees Fidelity collects, but do disclose that Fidelity receives such fees, as evidenced by the following screenshot:

| (a) Enter name and EIN or address (see instructions) | | | | | | |
|---|---|---|---|---|---|---|
| FIDELITY INVESTMENTS INSTITUTIONAL<br><br>04-2647786 | | | | | | |
| (b)<br>Service Code(s) | (c)<br>Relationship to employer, employee organization, or person known to be a party-in-interest | (d)<br>Enter direct compensation paid by the plan. If none, enter -0-. | (e)<br>Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f)<br>Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g)<br>Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h)<br>Did the service provider give you a formula instead of an amount or estimated amount? |
| 37 60 64<br>65 71 | RECORDKEEPER | 897469 | Yes [X]   No [ ] | Yes [X]   No [ ] | 0 | Yes [X]   No [ ] |
| (a) Enter name and EIN or address (see instructions) | | | | | | |

74.    Once again, SOUTHEASTERN admits Fidelity is paid indirect compensation, while at the same time disclosing that amount as "0" and then claiming that Fidelity provided it with a "formula instead of an amount or estimated amount."

75.    SOUTHEASTERN does not disclose to participants the formula or amount of indirect compensation the Plan pays to Fidelity.

76.    The indirect fees alone paid to Fidelity are far greater for the services provided than recognized to be reasonable for a plan with more than $1 billion dollars in assets.

77.    Given the growth and size of the Plan's assets during the Class Period and the general trend towards lower recordkeeping expenses in the marketplace, the Plan could have obtained recordkeeping services that were comparable or superior to the specific services that were provided to the Plan by Fidelity. Instead, as the information below demonstrates, SOUTHEASTERN caused the Plan to pay

- 26 -

recordkeeping fees that were too expensive for the specific services provided and too expensive in the market generally.

78. As to the Plan at issue here, Fidelity performs the following specific services for the Plan: validating payroll data, tracking employee eligibility and contributions, verifying participant status, information management, including computing, tabulating, and data processing, and mailing account statements to Plan participants. These are the same services provided by all recordkeepers of billion-dollar plans.

79. In some ways the services provided by recordkeepers are analogous to services provided by mortgage companies. The largest recordkeepers in the marketplace, like the largest mortgage companies in the marketplace, provide similar services. They compete on price. Prudent customers seeking a mortgage do not agree to pay ten times the price of a 30-year fixed mortgage for fungible services. Likewise, prudent ERISA fiduciaries do not cause Plan participants to pay excessive compensation to recordkeepers for fungible services.

80. The compensation described above which Defendant caused the Plan to pay Fidelity were and remain excessive in relation to the specific services that the Fidelity provided to the Plan because, in fact, the services that Fidelity provided were nothing out of the ordinary, they were fungible. These identical services could have been provided to the Plan by other recordkeepers in the marketplace and even by

Fidelity at a much lower cost to the Plan had SOUTHEASTERN satisfied its ERISA duty of prudence. Indeed, a prudent fiduciary would have observed the excessive fees being paid to Fidelity and taken corrective action.

81.    SOUTHEASTERN's failure to monitor and control Fidelity's compensation cost the Plan millions of dollars during the Class Period and constituted a breach of ERISA's duty of prudence.

82.    Recordkeeping costs for other plans of a similar size and who received the same specific services as the Plan here also demonstrate the Plan was paying excessive compensation to Fidelity.

83.    The chart below compares recordkeeping compensation of the Plan to comparable plans (*i.e.*, meaningful benchmarks) with similar numbers of participants and assets under management for the year 2021:

**CONTINUED ON NEXT PAGE**

| Plan Name | Record-keeper | Total # participants w/ account balances | Dollar value of plan assets | Total reported recordkeeping and administrative service costs paid in 2021 | Direct Record-keeping and administrative service costs per-participant basis[1] |
|---|---|---|---|---|---|
| **Southeastern Grocers 401k Savings Plan** | **Fidelity** | **12,174** | **$1,050,695,424** | **$897,469.00** | **$73.72** |
| RPM International Inc. 401(k) Plan | Fidelity | 10,039 | $1,256,018,208 | $92,649 | $9.23 |
| Netflix 401(k) Plan | Fidelity | 10,070 | $1,374,726,213 | 41,969 | $4.17 |
| Optum Care Mgt. LLC 401(k) Plan | Fidelity | 13,078 | $1,341,037,601 | 284,537 | $21.76 |
| Simplot Retirement Savings Plan | T. Rowe Price | 11,277 | $1,296,880,259 | $143,923 | $12.76 |
| Ralph Lauren Corp. 401(k) Plan | T. Rowe Price | 8,703 | $841,127,245 | $186,445 | $21.42 |

84.    The above benchmarking compares only fees paid to the above five plans' recordkeepers to direct compensation paid to similar plans' recordkeepers which, in three of the five examples, is Fidelity. Thus, SOUTHEASTERN caused its Plan to pay Fidelity excessive fees for the same services that Fidelity provided to comparator plans for much less. These examples are illustrative and not exhaustive. Plaintiff anticipates that expert witness reports will expand on the benchmarking herein and demonstrate conclusively that the Plan paid excessive and unreasonable fees.

85.    The RPM International Inc. Plan ("RPM Plan"), Netflix 401(k) Plan ("Netflix Plan"), and Optum Care Management Plan ("Optum Plan"), are meaningful benchmarks because they are similar with respect to assets and number of participants, and Fidelity provided the same services to all three.

86.    However, in 2021, participants in the RPM Plan, Netflix Plan, and Optum Plan paid only $9.23, $4.17, and $21.76 annually to Fidelity in direct compensation. On the other hand, Plan participants paid $73.72 per participant in direct compensation to Fidelity.

87.    The Simplot Retirement Savings Plan ("Simplot") and Ralph Lauren Corp. 401(k) Plan ("Ralph Lauren") have similar assets and number of participants to the Southeastern Plan. For both plans, T. Rowe Price was the recordkeeper and provided the same general recordkeeping and administrative services fidelity provided to the Southeastern Plan for a fraction of the cost ($12.76 and $21.42, respectively.)

88.    The Simplot and Ralph Lauren plans demonstrate that other established recordkeepers in the marketplace provide the same services as Fidelity for significantly less money.

89.    As demonstrated by these benchmarks, considering that the recordkeeping services provided by Fidelity in this case are the same as those provided by all national recordkeepers. SOUTHEASTERN's decision to cause the Plan and its participants to pay $73.72 per participant in 2021 was imprudent and illustrative of the excessive fees SOUTHEASTERN has caused the Plan to pay for entirety of the class period.

90.     A recent action against Fidelity supports Plaintiff's position on this discrete issue. Fidelity's own retirement plan was sued. In that case, the "parties [] stipulated that if Fidelity were a third party negotiating its fee structure at arms-length," the value of services Fidelity provides to plans like the Plan here "would range from $14 to $21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D. Mass. 2020).

91.     Additionally, in the *Moitoso* case Fidelity further stipulated as follows:

The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017, is $14 per participant, per year. ***Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity -record kept plan with at least $1 billion in assets during the Class Period*** (November 18, 2014, to the present).[2]

---

[2] *Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2. (Emphasis added.)

92.     The key takeaways from this stipulation by Fidelity are the fungible nature and true "value" of recordkeeping services. Fidelity submitted the declaration under penalty of perjury. And the declaration confirms SOUTHEASTERN could have negotiated a $14 per participant total fee for recordkeeping. Instead, SOUTHEASTERN is permitting Fidelity to charge the Plan over $73.00 annually per participant in direct compensation, and millions more in indirect compensation.

93.     SOUTHEASTERN failed to monitor the total compensation paid to Fidelity. Had it done so, SOUTHEASTERN could have (and should have) used the Plan's increasing size and long-standing relationship with Fidelity as bargaining power to reduce the Plan's costs. It failed to do so.

94.     Since 2018, SOUTHEASTERN has allowed excessive compensation to be paid to Fidelity during the Class Period, even though its duties, services, and costs did not grow in proportion.

95.     In sum, given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, SOUTHEASTERN could have obtained for the Plan recordkeeping services that were comparable to or superior to the typical services provided by Fidelity at a lower cost – likely by Fidelity itself – had SOUTHEASTERN acted as a prudent fiduciary would have

acted under the circumstances. But SOUTHEASTERN failed to do so and, as a result, violated its fiduciary duties under ERISA.

## FIRST CLAIM FOR RELIEF
### *Breach of Fiduciary Duty of Prudence*

96.  Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

97.  As a fiduciary of the Plan, SOUTHEASTERN was and remains subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

98.  SOUTHEASTERN breached these fiduciary duties in multiple respects, as discussed throughout this Complaint. SOUTHEASTERN failed to monitor or control the excessive compensation paid to Fidelity.

99.  As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had SOUTHEASTERN complied with its fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

100.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), SOUTHEASTERN is liable to restore to the Plan all losses caused by its breaches of fiduciary duties and must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for SOUTHEASTERN's breaches as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

For these reasons, Plaintiff, on behalf of the Plan and all Plan participants, respectfully requests that the Court:

1.    Find and declare that SOUTHEASTERN breached its fiduciary duties as described above;

2.    Find and adjudge that SOUTHEASTERN is personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

3.    Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

4.    Order SOUTHEASTERN to provide all accountings necessary to determine the amounts SOUTHEASTERN must make good to the Plan under §1109(a);

5.    Remove the fiduciaries who have breached their fiduciary duties and

enjoin them from future ERISA violations;

6.      Surcharge against SOUTHEASTERN and in favor of the Plan all amounts involved in any transactions that such accounting reveals were improper, excessive, and/or in violation of ERISA;

7.      Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

8.      Certify the Class, appoint the Plaintiff as class representative, and appoint the undersigned as Class Counsel;

9.      Award to the Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

10.     Order the payment of interest to the extent it is allowed by law; and

11.     Grant other equitable or remedial relief as the Court deems appropriate.

DATED this 27th day of September, 2023.

Respectfully submitted,

*/s/ Marc R. Edelman*
 **MARC R. EDELMAN**
Fla. Bar No. 0096342
**MORGAN & MORGAN, P.A.**
201 N. Franklin Street, Suite 700
Tampa, FL 33602
Telephone: 813-577-4722
Fax: 813-257-0572
Email: MEdelman@forthepeople.com

**BRANDON J. HILL**
Florida Bar Number: 37061

**LUIS A. CABASSA**
Florida Bar Number: 0053643
**AMANDA E. HEYSTEK**
Florida Bar Number: 0285020
**WENZEL FENTON CABASSA, P.A.**
1110 North Florida Ave., Suite 300
Tampa, Florida 33602
Telephone: (813) 337-7992
Facsimile: (813) 229-8712
Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com
Email: aheystek@wfclaw.com

**MICHAEL C. MCKAY**
(*Pro hac vice application forthcoming*)
**MCKAY LAW, LLC**
Arizona Bar No. 023354
5635 N. Scottsdale Road, Suite 170
Scottsdale, Arizona 85250
Telephone: (480) 681-7000
Email: mmckay@mckaylaw.us

*Attorneys for Plaintiff and the Class*