**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**CASE NO: 3:23-cv-01135-TJC-MCR**

JOYCE ULCH, on behalf of the
SOUTHEASTERN GROCERS 401(k)
SAVINGS PLAN, herself, and all others
similarly situated,

 Plaintiff,

v.

SOUTHEASTERN GROCERS LLC, as
Plan Sponsor for SOUTHEASTERN
GROCERS 401(K) SAVINGS PLAN,

 Defendant.

_____/

**<u>DEFENDANT'S MOTION TO DISMISS AND</u>**
**<u>MEMORANDUM OF LAW IN SUPPORT</u>**

**BRYAN CAVE LEIGHTON PAISNER LLP**

*/s/ W. Bard Brockman*
W. Bard Brockman
Florida Bar No. 0868817
Michael P. Carey *(PHV Pending)*
Georgia Bar No. 109364
One Atlantic Center, 14th Floor
1201 W. Peachtree Street, N.W.
Atlanta, Georgia  30309
Telephone: 404-572-4507
Facsimile: 404-572-6666
Email: bard.brockman@bclplaw.com
Email: michael.carey@bclplaw.com

*Attorneys for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... ii

I.    INTRODUCTION ...................................................................................1

II.   FACTUAL BACKGROUND ...................................................................2

    A.    The Plan .......................................................................................2

    B.    Fidelity's Services To The Plan And Associated Costs ......................4

    C.    Allegations in the FAC.................................................................5

    D.    The Plan's Administrative Procedures ...........................................6

III.  ARGUMENT ..........................................................................................7

    A.    Governing Legal Standards ...........................................................7

    B.    The FAC Fails To State A Claim Against SEG ...............................8

        1.    The FAC Fails to State a Claim Based on Allegedly Excessive Recordkeeping Fees.................................................8

        2.    The FAC Fails to State a Claim Based On Revenue Sharing Allegations .................................................................13

        3.    The FAC Fails to State a Claim Based on Fidelity's Retention of Float Income ...................................................15

    C.    Plaintiff's Failure To Make Meaningful Use Of The Administrative Proceeding Further Demonstrates The Implausibility Of Her Claims ....................................................................................................16

IV.   CONCLUSION....................................................................................19

LOCAL RULE 3.01(G) CERTIFICATION .......................................................20

CERTIFICATE OF SERVICE ........................................................................21

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..........................................................................................7

*Barrett v. O'Reilly Automotive, Inc.*,
112 F.4th 1135 (8th Cir. 2024) ................................................................ 8, 11, 13

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ..........................................................................................7

*Bickley v. Caremark RX, Inc.*,
461 F.3d 1325 (11th Cir. 2006) .......................................................................17

*Brooks v. Blue Cross & Shield of Fla., Inc.*,
116 F.3d 1364 (11th Cir. 1997).........................................................................3

*Chudasama v. Mazda Motor Corp.*,
123 F.3d 1353 (11th Cir. 1997).......................................................................18

*Collins v. Northeast Grocery, Inc.*,
___ F. Supp. 3d ___, 2024 WL 3829636 (N.D.N.Y. Aug. 15, 2024)............... 8, 13

*England v. DENSO Int'l Am., Inc.*,
2023 WL 4851878 (E.D. Mich. July 28, 2023) .................................................9

*In re Fidelity ERISA Float Litig.*,
829 F.3d 55 (1st Cir. 2016) (Souter, J.) .............................................................16

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014) ..........................................................................................7

*Fritton v. Taylor Corp.*,
2022 WL 17584416 (D. Minn. Dec. 12, 2022).................................................13

*Garland v. Snap-On Inc. Ret. Plan*,
2021 WL 1192991 (N.D. Ga. Mar. 8, 2021).....................................................17

*Gonzalez v. Northwell Health, Inc.*,
632 F. Supp. 3d 148 (E.D.N.Y. Sept. 30, 2022) ..............................................10

ii

*Harmon v. Shell Oil Co.*,
No. 3:20-cv-00021 (S.D. Tex.), ECF 134 (Mar. 1, 2021) ....................................13

*Hecker v. Deere & Co.*,
556 F.3d 575 (7th Cir. 2009) ................................................................................13

*In re ING Groep, N.V. ERISA Litig.*,
749 F. Supp. 2d 1338 (N.D. Ga. 2010) .................................................................3

*Kaylor v. Fields*,
661 F.2d 1177 (8th Cir. 1981) ..............................................................................18

*Krutchen v. Ricoh USA*,
2022 WL 16950264 (E.D. Pa. Nov. 15, 2022) .......................................................9

*Leimkuehler v. American Utd. Life Ins. Co.*,
713 F.3d 905 (7th Cir. 2013) ................................................................................13

*Mason v. Continental Grp., Inc.*,
763 F.2d 1219 (11th Cir. 1985) ............................................................................17

*Mateya v. Cook Grp. Inc.*,
2023 WL 4608536 (S.D. Ind. June 16, 2023) ........................................... 9, 12, 13

*Matousek v. MidAmerican Energy Co.*,
51 F.4th 274 (8th Cir. 2020) .............................................................................. 8, 12

*Moitoso v. FMR*,
No. 1:18-cv-12122-WGY (D. Mass.), ECF 138-67 (Sept. 6, 2019) ............... 12, 13

*Romano v. John Hancock Life Ins. Co. (USA)*,
2022 WL 1450770 (S.D. Fla. May 9, 2022) ........................................................16

*Sealy v. Old Dominion Freight Line, Inc.*,
2024 WL 2212905 (M.D.N.C. May 16, 2024) .....................................................16

*Singh v. Deloitte LLP*,
650 F. Supp. 3d 259 (S.D.N.Y. 2023) ..................................................... 9, 11, 13

*Smith v. CommonSpirit Health*,
37 F. 4th 1160 (6th Cir. 2022) ...............................................................................8

*Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v.*
*Morgan Stanley Inv. Mgmt., Inc.*,
712 F.3d 705 (2d Cir. 2013) .............................................................................. 7, 8

*Tibble v. Edison Int'l*,
  843 F.3d 1187 (9th Cir. 2016) ...............................................................7

*Tussey v. ABB, Inc.*,
  746 F.3d 327 (8th Cir. 2014) ....................................................... 13, 16

*Universal Express, Inc. v. SEC*,
  177 Fed. Appx. 52 (11th Cir. 2006).......................................................3

*Wehner v. Genentech*,
  2021 WL 507599 (N.D. Cal. Feb. 9, 2021) .........................................13

*Williamson v. Travelport, LP*,
  953 F.3d 1278 (11th Cir. 2020) ...........................................................17

*Young v. General Motors Inv. Mgmt. Corp.*,
  325 Fed. Appx. 31 (2d Cir. 2009) .........................................................8

**Statutes**

29 U.S.C. § 1001.....................................................................................1

29 U.S.C. § 1104(a) ...............................................................................5

Employee Retirement Income Security Act of 1974 ................................1

ERISA ......................................................................................... *passim*

ERISA Section 404(a)..........................................................................6, 7

ERISA Section 408(b).............................................................................6

**Other Authorities**

DOL Field Assistance Bulletin 2002-03 (Nov. 5, 2002)..........................15

Federal Rule of Civil Procedure 12(b) ....................................................3

Federal Rule of Civil Procedure 12(b)(6) ...................................... 1, 7, 17

COMES NOW Defendant Southeastern Grocers LLC ("SEG") and files this Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  SEG respectfully requests that the Court dismiss the action in its entirety.

## I.     INTRODUCTION

Plaintiff is a participant in the Southeastern Grocers 401(k) Savings Plan ("Plan").  She alleges that SEG, the Plan's administrator, breached fiduciary duties under ERISA[1] by allowing the Plan to incur excessive administrative expenses. Specifically, Plaintiff alleges that the Plan's recordkeeper, Fidelity, charged excessive recordkeeping fees and also received "unchecked" amounts of "indirect" compensation in the form of revenue sharing and float income.

Plaintiff's allegations cover well-worn territory in the field of ERISA litigation. In recent years, hundreds of similar suits have been filed against fiduciaries of other ERISA-governed retirement plans.  Plaintiff's First Amended Complaint ("FAC"), like the vast majority of these complaints, is not based on any direct allegation about how SEG monitored Fidelity's recordkeeping fees.  Instead, it alleges that five alleged "comparator" plans paid less for allegedly identical services during the same period, asking the Court to infer from this comparison that SEG must have been inattentive to fees.  To survive a motion to dismiss under this theory, Plaintiff must demonstrate that her self-selected comparators represent a meaningful benchmark, such that it is plausible to infer that SEG's process was flawed.

---

[1]   Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*

Here, the FAC's allegations about Fidelity's services are simply too cursory to survive a motion to dismiss.  Rather than allege details about the specific services provided by Fidelity or her comparator plans, the FAC asks the Court to assume that recordkeeping is a commodity, like a gallon of milk.  Courts have consistently rejected this overly simplistic approach, recognizing that 401(k) plan services are complex and may greatly differ from plan to plan.  Even if the Court were to accept Plaintiff's inherently implausible premise, the FAC fails to allege sufficient facts about how the comparator plans pay for recordkeeping to permit a fair comparison between those plans and the Plan.  According to the comparator plans' public filings, which are relied on in the FAC and may be considered on a motion to dismiss, most if not all of them *do not pay for recordkeeping services at all*.  Instead, the sponsor company pays for recordkeeping, and the numbers reported by those plans do not include those fees.  The Plan here cannot fairly be compared to plans that use a completely different method to pay, account for and report recordkeeping fees.

Plaintiff's allegations regarding Fidelity's indirect income also fail to state a claim.  They are conclusory and speculative, based on hypothetical dangers of indirect income arrangements rather than any concrete factual allegations specific to the Plan that would suggest that a breach of fiduciary duty occurred.

## II.    FACTUAL BACKGROUND

### A.    The Plan

The Plan is a "defined contribution" 401(k), designed to enable employees to save for retirement on a tax-advantaged basis.  FAC ¶ 15; Declaration of Michael

Carey ("Decl.") at Ex. 1.[2]  In a defined contribution plan, participants contribute a portion of their wages into individual, self-directed accounts (which also receive employer contributions), and decide how to invest those contributions from a pre-determined menu of investment options.  *See id.*  According to the Plan's publicly available annual reports (hereinafter, "Form 5500's"), the Plan's total net assets and number of participants with account balances ("Active Participants") as of December 31 of each year from 2017 to 2022 were as follows:

| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| **Total Net Assets** | $897.6M | $816.8M | $922.9M | $983.4M | $1.05B | $836.9M |
| **Active Participants** | 15,136 | 14,064 | 13,454 | 13,107 | 12,174 | 12,123 |

Decl. Exs. 2-7 at Form 5500 Item 6(g) (Active Participants), Schedule H Item 1(l) (Total Net Assets).

The Plan is governed by ERISA and a written Plan document.  FAC ¶ 16; Decl. Ex. 8.  SEG, the Plan's sponsor, is the named Plan Administrator, and in that role, it owes certain fiduciary duties under ERISA.  FAC ¶ 17; Decl. Ex. 1.  SEG

---

[2]  The exhibits to the motion are properly considered on a motion to dismiss because they are either referenced in the Complaint or central to its allegations.  *See Brooks v. Blue Cross & Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).  Exhibits 1 through 8 are core plan documents that courts routinely consider in ERISA cases.  *See, e.g., In re ING Groep, N.V. ERISA Litig.*, 749 F. Supp. 2d 1338, 1344 (N.D. Ga. 2010).  Exhibits 10 through 14 are correspondence regarding Plaintiff's administrative claim and appeal, referenced in Paragraphs 26-27 of the FAC.  The remaining exhibits are public records maintained by the Department of Labor, which the Court may consider on a Rule 12(b) motion.  *See Universal Express, Inc. v. SEC*, 177 Fed. Appx. 52, 53 (11th Cir. 2006) ("Public records are among the permissible facts that a district court may consider" on a motion to dismiss).

administers the Plan through a committee of officers and employees (the "Committee"). Decl. Ex. 1 p. 22. The Plan document authorizes the Plan Administrator to use Plan assets to pay for the Plan's "reasonable costs and expenses." Decl. Ex. 8 § 19.05. As authorized by the Plan document, certain Plan expenses, including recordkeeping costs, are ultimately charged to participant accounts. Id.

### B. Fidelity's Services To The Plan And Associated Costs

At all relevant times, the Plan engaged Fidelity, a leading retirement services company, to serve as the Plan's recordkeeper. FAC ¶ 46. A recordkeeper is generally responsible for maintaining participant-level data, processing transactions as directed by participants, communicating with participants, and similar functions. *Id.* ¶ 36. Throughout the Class Period, Fidelity received "direct" compensation from the Plan, including compensation intended to pay for its recordkeeping fee. FAC ¶ 46; Decl. Exs. 2-7 (Form 5500 Schedule C, Item 2). Between 2017 and 2022, Fidelity's reported direct compensation from the Plan was as follows:

| 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|
| $656,613 | $480,184 | $800,789 | $743,676 | $897,469 | $762,143 |

*See id.* at Item 2(d). The publicly-filed Form 5500s explain (through standardized "service codes") that the total figures listed above include not only recordkeeping fees, but also loan processing fees, account maintenance fees, and other charges relating to the processing of securities transactions. *See id.* at Item 2(b); Decl. Ex. 9

4

(identifying service codes).  Fidelity also received indirect income each year from 2017 to 2022 in connection with its services to the Plan.  *See id.* at Item 2(e).

### C.    Allegations In The FAC

Plaintiff alleges that Fidelity's direct compensation was excessive when compared to five allegedly similar plans sponsored by Netflix, OptumCare Management, Ralph Lauren, RPM International and Simplot.  FAC ¶ 92.  Plaintiff does not profess to know anything about these plans other than what they have reported in their own Form 5500s.  *See id.*  Using data from those filings, Plaintiff alleges that these plans are comparable to the Plan because they were similar in size and net assets during the 2021 Plan Year.  *See id.*  Plaintiff also alleges that the comparator plans received the same services, though she does not support that allegation with any facts other than that Fidelity was the recordkeeper for three of them during that year.  FAC ¶¶ 94, 96.  Finally with respect to direct compensation, Plaintiff alleges that Fidelity itself has stated in a court filing that the value of its services ranged from $14 to $21 during a period that partially overlaps the Class Period.  FAC ¶¶ 99-100.

Plaintiff further alleges that SEG breached fiduciary duties by failing to monitor *indirect* compensation earned by Fidelity.  *Id.* ¶¶ 48-51.  Plaintiff alleges that (1) Fidelity likely earned millions of dollars in revenue sharing and float income and (2) SEG must not have known this.  *Id.* ¶¶ 51, 57, 65.  Based on these allegations, the Amended Complaint contains a single count for breach of ERISA's duty of prudence, 29 U.S.C. § 1104(a).  *Id.* ¶¶ 105-109.

### D.    The Plan's Administrative Procedures

The Plan document requires the exhaustion of administrative remedies prior to filing suit.  Decl. Ex. 8 § 19.01.  Under the Plan's administrative procedure, participants must submit a written claim to the Plan Administrator.  *Id.*  The Committee, acting as Plan Administrator, must review the claim and notify the participant of its determination in writing within 90 days.  The participant has a right to appeal any adverse determination to the Plan Administrator within 60 days of receiving it.  The Committee, acting as Plan Administrator, must review the appeal and make a final decision within 60 days of receiving the appeal.  *Id.*  Here, Plaintiff filed her initial complaint without having exhausted her administrative remedies, but later agreed to stay this action to permit her to undergo the administrative process. [ECF No. 9].  Plaintiff submitted an administrative claim on December 20, 2023, which the Committee found to be without merit and denied on March 13, 2024. Decl. Exs. 10-11.  On May 1, 2024, Plaintiff submitted an appeal.  Decl. Ex. 12.  The Committee found the appeal to be without merit and notified Plaintiff of its final decision on June 26, 2024.  Decl. Ex. 14.  During the course of the administrative procedure, SEG produced over 9,000 pages of documents relevant to Plaintiff's claims, including (1) the Plan's governing documents, (2) the contracts through which Fidelity provides services to the Plan, (3) the Plan's fee-related disclosures under ERISA Sections 404(a) and 408(b), (4) Committee minutes and meeting materials during the Class Period, and (5) detailed accounting records showing each type of fee charged or collected by Fidelity during the Class Period, along with the

6

amounts of those fees between 2017 and 2022.  Decl. Exs. 13-14.

## III.   ARGUMENT

### A.   Governing Legal Standards

To withstand dismissal pursuant to Federal Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level.").  In ERISA breach of fiduciary duty cases, motions to dismiss serve as an "important mechanism for weeding out meritless claims."  *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).  This is because breach of fiduciary duty class actions present an enhanced risk of "meritless, economically burdensome lawsuits" that may discourage employers from offering employee benefit plans in the first place.  *See id*.

ERISA Section 404(a) sets forth a standard of conduct for Plan fiduciaries, which includes an ongoing duty to monitor the prudence of investment options and administrative expenses.  *See Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016).  The prudence test is one of *process*: "whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular [decision]."  *Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt., Inc.,* 712 F.3d 705, 716 (2d Cir. 2013).  Plaintiff makes no direct allegations regarding SEG's plan administrative process, electing instead to

allege that SEG's imprudence can be inferred from circumstantial facts.  In order for these allegations to state a claim, they must raise a plausible inference that SEG's processes were flawed.  *See id.*

**B.      The FAC Fails To State A Claim Against SEG**

1.      The FAC Fails to State a Claim Based on Allegedly Excessive Recordkeeping Fees

A claim that plan fiduciaries allowed the plan to incur excessive service provider fees is plausible only if the allegations demonstrate "that fees were excessive related to the services rendered."  *Young v. General Motors Inv. Mgmt. Corp.,* 325 Fed. Appx. 31, 33 (2d Cir. 2009); *Smith v. CommonSpirit Health,* 37 F. 4th 1160, 1169 (6th Cir. 2022).  Plaintiff must allege a "meaningful benchmark" in the form of a similarly situated plan that received the same services for less than what the Plan paid.  *See Barrett v. O'Reilly Automotive, Inc.*, 112 F.4th 1135, 1138 (8th Cir. 2024).

To prevail, then, Plaintiff must plead sufficient facts regarding the services rendered to the Plan and the comparator plans to show that those plans are a meaningful benchmark.  *See id.; Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 279 (8th Cir. 2020); *Collins v. Northeast Grocery, Inc.*, ___ F. Supp. 3d ___, 2024 WL 3829636, *12 (N.D.N.Y. Aug. 15, 2024).  The FAC elides this requirement by focusing instead on the range of services *offered* by recordkeepers in the market, rather than what services the plans actually paid for.  See, e.g., FAC ¶ 37 ("Nearly all recordkeepers in the marketplace offer the same range of services."); *id.* ¶ 74 ("The services offered by Fidelity are offered by all recordkeepers.").  These allegations fail

8

to nudge the FAC's inference of imprudence from possible to plausible.  *See Singh v. Deloitte LLP*, 650 F. Supp. 3d 259, 267 (S.D.N.Y. 2023) ("The plaintiffs' allegation that all recordkeepers offer the same range of services does not mean that all plans employing a particular recordkeeper receive an identical subset of services within that range."); *Mateya v. Cook Grp. Inc.*, 2023 WL 4608536, *3 (S.D. Ind. June 16, 2023) ("[T]he services a recordkeeper provides and the services a plan purchases are different[.]"); *England v. DENSO Int'l Am., Inc.*, 2023 WL 4851878, *3 n.5 (E.D. Mich. July 28, 2023) (collecting cases addressing boilerplate allegations regarding services offered by ERISA plan recordkeepers).

This is to say nothing of the differences in quality of service offered by various recordkeepers—or even the same recordkeeper, who might offer enhanced features for a higher price.  *See Krutchen v. Ricoh USA*, 2022 WL 16950264, at *3 (E.D. Pa. Nov. 15, 2022) ("Fiduciaries may select diverse services from bundled offerings or elect additional a la carte services, prioritizing various options differently depending on their plans' unique needs and reasonably choosing to pay more for higher quality services.")  Put simply, the FAC's allegations about the Plan's services, and those received by the comparator plans, are insufficient to allow a plausible inference that the services were unreasonably expensive.

The FAC's side-by-side comparison of the Plan's "direct compensation" paid to Fidelity versus the direct compensation the comparator plans paid to their

9

recordkeepers (FAC ¶ 92) also fails to support a claim.[3]  As the FAC itself admits, there are many different ways in which ERISA plan recordkeepers may be compensated for their services.  See FAC ¶ 40 (recognizing direct and indirect compensation models); *id.* ¶ 45 ("Recordkeepers in the marketplace offer an array of other fee and expense models"); ¶ 61 (describing revenue sharing, an indirect model, and acknowledging that it is not *per se* imprudent).  The amount of direct compensation must be reported on a Form 5500, while the amount of indirect compensation need not be reported if the recordkeeper has complied with Department of Labor disclosure rules.  See Decl. Exs. 2-7 at Schedule C, Item 2(g) (requiring disclosure of total indirect compensation **excluding** eligible compensation reported in Item 2(f)).  Reported direct compensation, therefore, is an unreliable metric to compare recordkeeping costs.  *See Gonzalez v. Northwell Health, Inc.*, 632 F. Supp. 3d 148, 166 (E.D.N.Y. Sept. 30, 2022) (direct fee analysis "provides little insight" into whether total recordkeeping fees were excessive).

The FAC skips over a different reason why a recordkeeper's reported direct compensation might be lower in some cases than others—sometimes, the plan does not pay such costs at all, because the sponsor company does so.  If the sponsor pays for the service, the Plan's financial statements may not report the expense as a plan expense on the Form 5500.  A careful examination of the comparator plans' Form

---

[3]   Although the chart accompanying FAC ¶ 92 uses the vague heading "Total reported recordkeeping and administrative service costs paid in 2021," it appears to be comparing the information on Form 5500 Schedule C, Item 2(c) as it pertains to each plan's recordkeeper.

5500s, which the Court may consider on a motion to dismiss,[4] shows that this is what happened here for most if not all of the comparator plans. For instance, the auditor's report accompanying the Netflix 401(k) Plan's 2021 Form 5500 states, with respect to administrative expenses:

> Certain administrative expenses of the Plan, **including record-keeping and audit fees, were paid directly by the Company** for the year ended December 31, 2021. **The Plan is not required to reimburse the Company for expenses paid by the Company.**

Decl. Ex. 15 at Independent Auditor's Report p. 9. Similar notes can be found in the auditor's reports accompanying the other four plans. See Decl. Ex. 16 (RPM International 401(k) 2021 Form 5500) at Independent Auditor's Report p. 7 ("The Company directly pays administrative costs associated with participant recordkeeping services for active (non-terminated) participants."); Decl. Ex. 17 (OptumCare Management LLC 401(k) 2021 Form 5500) at Independent Auditor's Report p. 11 ("Certain expenses of maintaining the Plan are paid by the Plan, unless otherwise paid by the Company. *Expenses that are paid by the Company are excluded from these financial statements.*"); Decl. Ex. 18 (Simplot Retirement Savings Plan 2021 Form 5500) at Independent Auditor's Report p. 9 (identical disclosure to the OptumCare Management plan); Decl. Ex. 19 (Ralph Lauren Corporation 401(k) Plan 2021 Form 5500) at Independent Auditor's Report p. 11 ("Administrative

---

[4] In excessive fee cases, Form 5500s used as source material for the complaint are "embraced by the pleadings" and may be considered on a motion to dismiss. *See Barrett*, 112 F.4th at 1139; *Singh*, 650 F. Supp. 3d at 267 n.3.

11

expenses of the Plan, except for loan processing and redemption fees, if applicable, are paid by the Plan Sponsor or the Trust, as provided for in the Plan document. Expenses paid by the Plan Sponsor are excluded from the Plan's financial statements."). Plaintiff's "price tag to price tag" comparison fails to raise a plausible inference of a breach—it simply reflects the reality that some plans pay directly for recordkeeping while others do not.

The FAC also alleges that Fidelity itself represented, in a stipulation filed in a lawsuit involving Fidelity's own 401(k) plan, that the value of the recordkeeping services that it provided to that plan ranged between $14 to $21 between 2014 and the time of the stipulation. FAC ¶¶ 99-100 (citing *Moitoso v. FMR*, No. 1:18-cv-12122-WGY (D. Mass.), ECF 138-67 (Sept. 6, 2019). This allegation fails to nudge the FAC any closer to plausibility, for a number of reasons. First, it says nothing about what services Fidelity was referring to, or how they compared to the services Fidelity provided to the Plan. *See Mateya*, 2023 WL 4608536, at *6. Second, there are no allegations that the Fidelity plan is a meaningful benchmark. Fidelity's plan had over 50,000 active participants and over $12 billion in assets between 2017 and 2019, making it more than 3 times larger (in terms of participants) and more than 10 times larger (in terms of net assets) than the Plan during those years. Decl. Exs. 20-22 (Fidelity 401(k) Form 5500) at Item 6(g) and Schedule H, Item 1(l). Given the FAC's other allegations that the size of the plan is the most significant factor affecting recordkeeping costs (see, e.g., FAC ¶¶ 39, 86), these sharp differences in size render a comparison to the Fidelity plan meaningless. *See Matousek*, 51 F.4th at

12

279.  Finally, Fidelity itself has publicly stated, in a later litigation filing, that the stipulation "certainly does not reflect the value of recordkeeping services that Fidelity provides to different plans pursuant to different recordkeeping contracts for a different set of services."  *Harmon v. Shell Oil Co.*, No. 3:20-cv-00021 (S.D. Tex.), ECF 134 (Mar. 1, 2021).  Other courts addressing allegations about the *Moitoso* stipulation have reached the same conclusion.  *See Mateya, supra; Fritton v. Taylor Corp.*, 2022 WL 17584416, at *8 (D. Minn. Dec. 12, 2022); *Wehner v. Genentech*, 2021 WL 507599, at *6 (N.D. Cal. Feb. 9, 2021).

Because none of the FAC's allegations, taken separately or as a whole, demonstrate a meaningful benchmark, dismissal is warranted.  *See Barrett, supra; Collins, supra; Singh, supra.*

> 2.  The FAC Fails to State a Claim Based On Revenue Sharing Allegations

Likewise, the FAC's allegations relating to revenue sharing fail to state a claim that SEG acted imprudently.  Revenue sharing is a practice in which investment fund managers pay a portion of the fees they charge to investors—known as the fund's "expense ratio"—to the recordkeeper.  *See Leimkuehler v. American Utd. Life Ins. Co.*, 713 F.3d 905, 909 (7th Cir. 2013).  Revenue sharing is viewed as "indirect" compensation because it is not paid directly by the Plan.  FAC ¶ 58.  Revenue sharing is a common and accepted practice.  *See Tussey v. ABB, Inc.*, 746 F.3d 327, 331 (8th Cir. 2014); *Hecker v. Deere & Co.*, 556 F.3d 575, 585 (7th Cir. 2009) (abrogated on other grounds).  The FAC itself acknowledges that a plan's use of revenue sharing

13

does not, by itself, give rise to a prudence claim.  See FAC ¶ 59 ("Revenue sharing, while not a *per se* violation of ERISA…"); *id.* ¶ 61 ("[Allowing] recordkeepers to collect fees indirectly is not *per se* imprudent.").

By its own admission, then, the FAC must allege facts specific to the Plan's use of revenue sharing to state a prudence claim.  It completely lacks these allegations—there is no allegation about which Plan funds used revenue sharing, how the use of revenue sharing caused the Plan's expenses to be higher than if a different compensation method had been used, or whether Plaintiff herself ever invested in the funds that used revenue sharing.  Nor are there any allegations that compare the Plan's use of revenue sharing to other plans, including the five comparator plans.[5]

The FAC distracts from its lack of specific, non-conclusory allegations about the Plan's use of revenue sharing by focusing on generalities about the *potential* dangers of revenue sharing, as described by critics of the practice.  See, e.g., FAC ¶ 61 ("*As one commentator noted,* [a]t worst, revenue sharing…is a way to hide fees."); *id.* ¶ 62 ("*Another commentator* likened a revenue-sharing fee arrangement to…paying [a] plumber based on the amount of water that flows through the pipe rather than the actual work provided.").  Echoing these pundits, Plaintiff alleges that revenue

---

[5]   Notably, each of the comparator plans' Form 5500s discloses that the recordkeeper earned indirect income and does not disclose the dollar amount.  See Decl. Exs. 15-19 at Schedule C, Items 2(e), 2(g).  These disclosures are identical to the Plan's response to the same items.

sharing "*can be* devastating" for plan participants.  *Id.* ¶ 61.  What she needs to allege, and does not, is that revenue sharing *was* devastating for *this* Plan and its participants.  When describing the Plan itself, Plaintiff relies only on conclusory allegations that the Plan fiduciaries allowed "unchecked" amounts of revenue sharing.  Without further detail, Plaintiff's allegations are an exercise in speculation that do not state a claim.

> 3.   The FAC Fails to State a Claim Based on Fidelity's Retention of Float Income

Finally, the FAC alleges that SEG acted imprudently by allowing Fidelity to earn allegedly excessive amounts of float income.  FAC ¶ 51.  According to the FAC, Fidelity holds cash awaiting withdrawal or investment in an omnibus clearing account "for at least 2-3 days" before the transaction is cleared.  *Id.*  Fidelity's contract with SEG permits Fidelity to retain investment income and/or interest earned on these funds.  *Id.*  This income is called "float income" and, like revenue sharing, is indirect compensation.  *Id.*

The FAC does not allege, nor is it the case, that such an arrangement violates ERISA.  The only authority it cites is Department of Labor guidance addressing when an agreement relating to float may be regarded as a prohibited transaction.  *See* DOL Field Assistance Bulletin 2002-03 (Nov. 5, 2002).  Plaintiff is not pursuing a prohibited transaction claim.  Instead, much like her revenue sharing allegations, Plaintiff uses the Field Assistance Bulletin as a jumping off point to allege what *could* happen if float agreements were abused by recordkeepers.  Specifically with regard to

15

the Plan, Plaintiff poses a hypothetical, assuming a rate of return of 1 percent, that Fidelity could have earned $2.95 million on the $295 million that was allegedly transferred into and out of the Plan during 2021.[6]  Recently, in another lawsuit filed by Plaintiff's counsel, the court found that nearly identical allegations regarding float income failed to support the plausibility of the plaintiffs' claim.  *See Sealy v. Old Dominion Freight Line, Inc.*, 2024 WL 2212905, *7-8 (M.D.N.C. May 16, 2024) ("[Plaintiffs] have cited no case to support their 'float' theory…Moreover, Plaintiffs have cited no case to suggest that float income should be considered at all for a duty of prudence claim.").[7]  The FAC comes no closer to alleging a plausible claim based on float.

## C.    Plaintiff's Failure To Make Meaningful Use Of The Administrative Proceeding Further Demonstrates The Implausibility Of Her Claims

The aforementioned grounds are sufficient on their own to warrant dismissal of the FAC.  Further support for dismissal can be found in the procedural history of the case, which includes a now-completed administrative review of Plaintiff's claims.

---

[6]    The source of Plaintiff's $295 million figure is unclear, but even if it is correct, Plaintiff's calculation is nonsensical.  $2.95 million would be a 1 percent return on $295 million invested for an entire year.  The FAC, however, alleges that funds were held in Fidelity's omnibus account for approximately "2-3 days" prior to investment or distribution.  FAC ¶ 49.  If $295 million were held in the account for an average of 2-3 days, a 1 percent return would yield approximately $25,000 over the course of the year.

[7]    To the extent that Plaintiff alleges that float income is a plan asset giving rise to fiduciary duties, that allegation is a legal conclusion not entitled to the presumption of truth on a motion to dismiss and is contrary to case law.  *See In re Fidelity ERISA Float Litig.*, 829 F.3d 55, 59-60 (1st Cir. 2016) (Souter, J.); *Tussey*, 746 F.3d at 339-40; *Romano v. John Hancock Life Ins. Co. (USA)*, 2022 WL 1450770, *25 (S.D. Fla. May 9, 2022) (citing *Tussey* and noting its agreement with the Department of Labor's definition of plan assets).

The Eleventh Circuit requires ERISA plaintiffs to exhaust their administrative remedies before suing in federal court, even for fiduciary breach claims. *See Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1328 (11th Cir. 2006). The rule requiring exhaustion serves a number of important purposes:

> Administrative claim-resolution procedures reduce the number of frivolous lawsuits under ERISA, minimize the cost of dispute resolution, enhance the plan trustees' ability to carry out their fiduciary duties expertly and efficiently by preventing premature judicial intervention in the decision-making process, and allow prior fully considered actions by pension plan trustees to assist courts if the dispute is eventually litigated.

*Mason v. Continental Grp., Inc.*, 763 F.2d 1219, 1227 (11th Cir. 1985). Consistent with these policy goals, once a claim has completed the administrative review process, the Court may consider the administrative record, even on a Rule 12 motion. *See Williamson v. Travelport, LP*, 953 F.3d 1278, 1289 (11th Cir. 2020); *Garland v. Snap-On Inc. Ret. Plan*, 2021 WL 1192991, at *4-5 (N.D. Ga. Mar. 8, 2021).

Here, SEG is not asking the Court to adopt or consider any of the Committee's findings of fact for purposes of the Motion to Dismiss. But it also cannot be ignored that prior to filing the FAC, Plaintiff received detailed documentation explaining the services offered by Fidelity, the types of fees charged by Fidelity, how its total compensation was calculated, and how SEG historically tracked and monitored Fidelity's compensation. These documents show, among other things, that (1) Fidelity charged the Plan a flat $40 per participant fee, which was *reduced* by any revenue sharing or float income Fidelity received, (2) Fidelity provided the Plan with all required disclosures regarding its indirect sources of

17

income; (3) the Plan's use of revenue sharing significantly dropped early in the Class Period, with only six or fewer Plan funds using revenue sharing since 2018, and (4) Fidelity's float income never exceeded $50,000 during the years 2017-22, and was typically much less. Decl. Ex. 14.

Despite being armed with these documents and the Committee's findings, Plaintiff's only change to her original complaint was to add four new paragraphs which simply state that the administrative review procedure took place. FAC ¶¶ 25-28. Plaintiff made no substantive changes to her allegations.

Among the allegations that are unchanged are classic appeals for the need for discovery. See, e.g., FAC ¶ 51 ("Discovery will prove Fidelity earned millions of dollars in float compensation"); *id.* ¶ 66 ("[T]he precise amount of revenue sharing dollars Fidelity collected can only be obtained through formal discovery"). Plaintiff will undoubtedly cite the need for discovery in opposing this Motion. These claims are highly disingenuous given that Plaintiff had an opportunity to learn the facts through the administrative proceeding, could have amended or withdrawn her complaint, and failed to do so. "Discovery should follow the filing of a well-pleaded complaint. It is not a device to enable a plaintiff to make a case when his complaint has failed to state a claim." *Kaylor v. Fields*, 661 F.2d 1177, 1184 (8th Cir. 1981); *accord Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1368 (11th Cir. 1997) ("Allowing a case to proceed through the pretrial processes with an invalid claim that increases the costs of the case does nothing but waste the resources of the litigants in the action before the court, delay resolution of disputes between other litigants,

18

squander scarce judicial resources, and damage the integrity and the public's perception of the federal judicial system.").

## IV.   CONCLUSION

For these reasons, the Court should dismiss the FAC in its entirety with prejudice.

This 15th day of October, 2024.

**BRYAN CAVE LEIGHTON PAISNER LLP**

/s/ *W. Bard Brockman*
W. Bard Brockman
Florida Bar No. 0868817
Michael P. Carey *(PHV Pending)*
Georgia Bar No. 109364
One Atlantic Center, 14th Floor
1201 W. Peachtree Street, N.W.
Atlanta, Georgia  30309
Telephone: 404-572-4507
Facsimile: 404-572-6666
Email: bard.brockman@bclplaw.com
Email: michael.carey@bclplaw.com

*Attorneys for Defendants*

## LOCAL RULE 3.01(G) CERTIFICATION

Pursuant to Local Rule 3.01(g), the undersigned counsel state that they have conferred regarding the instant Motion and that Plaintiff opposes the motion.

This 15th day of October, 2024

BRYAN CAVE LEIGHTON PAISNER LLP

*/s/ W. Bard Brockman*
W. Bard Brockman
Florida Bar No. 0868817
One Atlantic Center, 14th Floor
1201 W. Peachtree Street, N.W.
Atlanta, Georgia  30309
Telephone: 404-572-4507
Facsimile: 404-572-6666
Email: bard.brockman@bclplaw.com

*Attorney for Defendant*

20

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 15th day of October, 2024, the foregoing was electronically filed with the Clerk of the Court via the CM/ECF system, which will send a notice to all counsel of record.

**BRYAN CAVE LEIGHTON PAISNER LLP**

*/s/ W. Bard Brockman*
W. Bard Brockman
Florida Bar No. 0868817
Michael P. Carey *(PHV Pending)*
One Atlantic Center, 14th Floor
1201 W. Peachtree Street, N.W.
Atlanta, Georgia  30309
Telephone: 404-572-4507
Facsimile: 404-572-6666
Email: bard.brockman@bclplaw.com
Email: michael.carey@bclplaw.com

*Attorneys for Defendants*

21